IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO. 05-582 |
| v. | : | CIVIL NO. 09-675 |
| | : | |
| CHRISTOPHER DENMARK | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                                    **AUGUST       , 2009**

Presently before this Court is Petitioner, Christopher Denmark's ("Denmark"), *pro se* Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. **§** 2255 ("Def's. § 2255 Mot.").[1] For the reasons set forth below, this Motion is denied.

**I.   BACKGROUND**

On September 29, 2005, a federal grand jury for the Eastern District of Pennsylvania returned a three-count indictment charging Denmark with conspiracy to commit arson in violation of 18 U.S.C. § 844(n), committing and aiding and abetting an arson in violation of 18 U.S.C. § 844(i), and making false statements in bankruptcy in violation of 18 U.S.C. § 152(3). These charges stem from Denmark's plan to burn down his North Philadelphia nightclub, his participation in the arson, and his false statements in bankruptcy related to that arson.

On February 23, 2004, Denmark and his co-defendant Samuel Dawkins,[2] set fire to a North Philadelphia building which consisted of Denmark's first-floor nightclub, Club Passion

---

[1] Denmark also filed a Motion to Supplement Pending Motion Under 28 U.S.C. § 2255 ("Mot. to Supp. § 2255").

[2] On May 5, 2006, Dawkins pled guilty before this Court to arson and conspiracy to commit arson. He was sentenced on September 5, 2006 to sixty months in prison, and three years on supervised release.

("the Club"), and two second floor apartments.  At the time, Denmark was heavily in debt and had just defaulted on his mortgage.  He filed for bankruptcy, in which he filed false affidavits and testified falsely under oath as to his liabilities related to the Club.

Denmark proceeded to trial before this Court on May 8, 2006.[3]  On May 11, 2006, Denmark was convicted by a jury on all counts, and he was sentenced on September 5, 2006 to 93 months imprisonment, and 3 years supervised release.[4]  On May 6, 2008, the Third Circuit Court of Appeals affirmed Denmark's conviction and sentence.  See United States v. Denmark, 277 Fed. Appx. 142 (3d. Cir. 2008).[5]

Denmark filed the instant Motion on February 18, 2009, and his Supplemental Motion on April 13, 2009.  He contends that, at sentencing, this Court wrongfully retroactively applied the law handed down in Untied States v. Booker, 543 U.S. 220 (2005) with regards to the Sentencing Guidelines.  Denmark also raises the following ineffective assistance of counsel claims:

> (1)  sentencing counsel were ineffective for failing to bring to this Court's attention at sentencing "newly discover evidence" that a witness recanted his testimony;
> (2)  trial counsel failed to effectively cross-examine witness, Tarez Smith;
> (3) trial counsel was ineffective for failing to object to witness, Tarez Smith's, testimony concerning Smith's father;
> (4) trial counsel was ineffective for failing to call prior counsel as witnesses at trial;
> (5)  trial counsel was ineffective for failing to investigate information that Denmark gave him concerning his accountant,

---

[3] Denmark was represented at trial by Giovanni Campbell, Esq. ("trial counsel"), whom he privately retained.

[4] After trial, Denmark hired Jonathan Feinberg, Esq., and Jed Melnick, Esq. ("sentencing counsel"), for purposes of sentencing.

[5] Denmark was represented by court-appointed counsel, Christopher Warren, Esq. ("appellate counsel"), on appeal.

Kenneth Booth; and

(6) trial counsel was ineffective for failing to disqualify a biased juror.

## II. STANDARD OF REVIEW

Denmark is entitled to relief only if his custody or sentence violate federal law or the Constitution. Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (West 2008). A district court is given discretion in determining whether to hold an evidentiary hearing on a habeas petition under § 2255. See Gov't of the V. I. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989). In exercising that discretion, the court must first determine whether the Petitioner's claims, if proven, would entitle him to relief, and then consider whether an evidentiary hearing is needed to determine the truth of the allegations. See Gov't of the V.I. v. Weatherwax, 20 F.3d 572, 574 (3d Cir. 1994). Accordingly, a district court may summarily dismiss a motion brought under § 2255 without a hearing where the "motion, files, and records, 'show conclusively that the movant is not entitled to relief.'" United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994) (quoting U.S. v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992)).

## III. DISCUSSION

**1.   Booker Claim**

Denmark first argues that the "application of Booker was impermissible [sic]

retroactively to pre-Booker conduct." (Mot. to Supp. § 2255 at 1). In United States v. Booker, supra, the United States Supreme Court rendered the Sentencing Guidelines advisory, as opposed to mandatory. At sentencing in this case, counsel for Denmark argued that "we wish to preserve in a general sense . . . our objection to finding enhancements and upward adjustments without proof beyond a reasonable doubt with respect to pre-Booker conduct on the ground that that is a violation of the *ex post facto* clause." (Sentencing Hr'g., Sept. 5, 2006 at 5.)[6]

      This claim, however, is without merit. It is first noted that Denmark acknowledged at the sentencing hearing that the Third Circuit has already rejected this claim. See United States v. Pennavaria, 445 F.3d 720, 723 (3d Cir. 2006). He, nonetheless, argued that "in the event the Supreme Court should reach a different conclusion, or in the event the state of the law changes, we expressly preserve the *ex post facto* claim here." (Def.'s Sentencing Mem. at n. 3.) In Pennavaria, the Third Circuit rejected the defendant's argument that remand for re-sentencing post-Booker for sentencing under an advisory guideline would constitute an *ex post facto* violation of the Due Process Clause. The court pointed out that in Booker, the Supreme Court "clearly instructed that both of its holdings should be applied to all cases on direct review." Id. at 723. Since Pennavaria is still the law in this Circuit, this claim must be dismissed.

---

[6]Counsel stated further that this "objection is set forth in greater detail at Footnote 3, page 4 of our Sentencing Memorandum." (Sentencing Hr'g., Sept. 5, 2006 at 5). This footnote states that Denmark:
> "wishes to preserve his objection to retro application of the *Booker* remedial holding on the ground that such application is in violation of the *Ex Post Facto* clause of the Constitution. Specifically, should the Court follow the findings in the PSI and thereby engage in judicial fact finding as arguably permitted under an advisory sentencing scheme, the Court will be retroactively applying the holding of *Booker* creating that advisory scheme to pre-*Booker* conduct." (Def.'s Sentencing Mem. at n. 3.)

**2.     Ineffective Assistance of Counsel Claims**

In <u>Strickland v. Washington</u>, the Supreme Court of the United States set forth a two-prong test for evaluating a claim of ineffective assistance of counsel.  466 U.S. 668 (1984).  A finding against the Petitioner under either prong is sufficient to find for the government.  <u>United States v. Ciancaglini</u>, 945 F. Supp. 813, 816 (E.D. Pa. 1996).

First, Petitioner must show that counsel's performance was deficient, meaning that counsel made errors so serious as to deprive Petitioner of the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland</u>, 466 U.S. at 687.  This evaluation must be based upon the facts of the case at the time of counsel's conduct.  <u>Id.</u> at 690.  "[T]he right to effective assistance of counsel does not guarantee that an attorney will never err."  <u>Diggs v. Owens</u>, 833 F.2d 439, 446 (3d Cir. 1987).  Therefore, to satisfy this prong, Petitioner must show that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms.  <u>Id.</u> at 688.  However, "[a]n attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial."  <u>Diggs</u>, 833 F.2d at 444-45.  Consequently, great deference is given in evaluating counsel's performance, and there is a strong presumption that counsel's challenged actions constitute sound trial strategy.  <u>Strickland</u>, 466 U.S. at 689.

Second, even if the Court finds counsel's conduct to have been deficient, Petitioner must nevertheless show that his defense was prejudiced by the deficient performance in order to justify setting aside the verdict.  <u>United States v. Griffin</u>, No. 91-612, 1993 WL 34927, at *5 (E.D. Pa. Feb. 9, 1993).  To establish the requisite prejudice under this second prong, Petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, i.e., one having a reliable

result.  Strickland, 466 U.S. at 694.  In order to do so, Petitioner must establish a reasonable probability that but for counsel's errors, the result of the trial would have been different.  Id.  A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.  Id.  This second prong must be evaluated by a totality of the circumstances existing at the time of the trial since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Griffin, 1993 WL 34927, at *5 (quoting Strickland, 466 U.S. at 696).  Guided by the above principles, we will address each of Denmark's claims separately.

    **A.  Recantation of Testimony**

Denmark first asserts that after his sentencing before this Court, he was held at the Philadelphia Detention Center, and that there, defense witness Tarez Smith ("Smith") confessed in the presence of cellmate named Keith Clark ("Clark") that he had given false testimony at trial in order to reduce his sentence on a pending drug charge.  Denmark alleges that Smith admitted that he set the fire at the Club, and that his sentencing attorneys obtained a statement from Clark regarding the confession.  Although it is unclear from his Motion, it appears that Denmark is claiming that his sentencing attorneys rendered ineffective counsel by not bringing this "newly discovered evidence" to the Court's attention.  (Def's. § 2255 Mot. at 6.)  This claim is without merit for several reasons.

Smith testified at trial that he worked at the Club on February 23, 2004.  He stated that his job was to arrive at approximately 2:00 a.m., the time the Club closed, and to clean and take out trash.  He testified that when he arrived there, he saw Denmark and several other men, and also noticed several plastic spring water jugs on the floor.  He added that he was only there a

short time and had not finished his jobs when Denmark told him to go home. He then left the premises and headed for his car. (N.T. May 9, 2006 at 104-111). Before reaching his car, Denmark stated that "cops came out of nowhere and I got arrested." (Id. at 111:10). He was placed into a police wagon with another person who was arrested outside the club. Smith testified that this person had "oil or gasoline on him." (Id. at 113:18). At the police station where he was taken, he gave a statement to the police as to what he saw that night at the Club. (Id. at 114). Smith testified that one or two days after he gave his statement, Denmark came over his house with a copy of the statement he had given to the police, and that he wanted him to go back to the detective division and give another statement. Smith did not do so at that time, although he told Denmark that he would. (Id. at 115-16). Smith testified further that on a night in May 2004, he arrived home to find Denmark waiting for him. Denmark again wanted Smith to recant his previous statement to the police and to write another one, which he did at Denmark's direction. (Id. 117-18). Smith testified:

> Q. Okay. And how was it that you came up with the words to write down?
> A. I was being told what to write.
> Q. All right. Who told you directly what to write down?
> A. Mr. Denmark.
> Q. And how - - was he essentially dictating it or saying to you the exact words to write down?
> A. Yes.
> Q. All right. Did Mr. Denmark tell you why he wanted you to write these words down on a piece of paper?
> A. Basically saying that the - - so that the first one wouldn't be true, or whatever.
> Q. Okay. When you finished writing those - - these words down on this paper, did you sign it?
> A. Yes. I remember I did sign it.
> Q. All right. After you finished writing down the words that Mr. Denmark gave you and signing it, what did you and Mr. Denmark

>do with this piece of paper?
>A.  We left - - I believe we copied a photo of my ID onto the paper and took it to the police station.

(Id. at 118:23-119:19).

It is apparent from the above sworn trial testimony that Denmark had coerced Smith into recanting his earlier testimony.  The jury made a rational credibility finding, crediting Smith's trial testimony and rejecting trial counsel's suggestion that Smith's testimony was unreliable.[7]  In light of Denmark's prior attempts to coerce Smith into changing his initial statement to the police, Smith's testimony at trial, and most importantly, the fact that Denmark has not produced a statement from Smith's cellmate concerning recantation of his testimony, there is no basis in the record for this claim.[8]

### B.  Cross-Examination of Smith

Next, Denmark claims that trial counsel failed to adequately cross-examine Smith concerning what he saw that night.  Denmark asserts that:

>"Counsel failed to adequately cross-examine Smith who stated he came to the bar at 2:00 a.m. and was sent home 'within seconds.'  He said he heard an 'explosion' while walking to the corner.  He said he stopped to speak with a friend and did not return to the bar to see if everyone was ok."

(Def's. § 2255 Mot. at 7.)

However, a reading of Smith's cross-examination indicates that counsel more than

---

[7]In his Motion, Denmark asserts another ineffective counsel claim that trial counsel was ineffective for failing to investigate purported "false statements" made by Smith.  (Def's. § 2255 Mot. at 7.)  This claim, however, merely reiterates the above contention, and will not be addressed.

[8]In addition, if sentencing counsel had obtained such a statement, they surely would have brought it to the attention of the Court.

effectively attacked and attempted to impeach Smith's testimony. The record reflects that trial counsel extensively questioned Smith about a prior drug conviction, the time frame of his arrival and departure at the Club, who and what he saw while he was there, and the events that took place after he left the Club, including his arrest, his statement to the police, and his later recantation of this statement. (N.T. May 9, 2006 at 145-76, 185-89).

Included in this ineffective claim, Denmark also contends that trial counsel failed to introduce evidence from a waitress named Lertha Townsend ("Townsend"), who told the police that she was at the Club after 2:00 a.m. counting money with two other individuals. Denmark has submitted an unsworn statement from Townsend wherein she states that her waitress shift ended at 2:00 a.m., and that she did not smell gas or see any gas cans at the Club. (Def's. § 2255 Mot., Ex. C.) Denmark asserts that this statement somehow conflicts with the time that Smith maintains that he arrived and left the Club. This statement, however, in no way impeaches Smith's testimony. In fact, Townsend acknowledged that she did not know exactly when she left the Club. She said in her statement that she did not "remember the exact time [she] was paid and when [she] left the bar. But it was after the bar closed." (Id.)

Denmark has also included in this ineffective counsel claim the contention that trial counsel failed to cross-examine Steve Owens ("Owens"), a tow truck driver, "who flagged down the police at 2:20 a.m. and said that he saw two males jump from the 2nd floor window of the bar while it was on fire and positively identified Smith and Dawkins." (Def's. § 2255 Mot. at 6-7.) In support of this claim, Denmark refers to a police report that Owens gave to a Detective Richardson. (See Def's. § 2255 Mot., Ex. D.) However, a review of this statement clearly reflects that Owens never "positively identified" Smith as one of the males whom he saw jump

9

out of the Club's window. Rather, Owens only stated to Detective Richardson that one "male had a white and blue cap on, black or dark blue jacket, dark colored jeans, he was about 6' tall, medium build, and dark complected, and the other male got away from the cops." (Id.) In addition, Owens testified at trial and never identified Smith as one of the males whom he witnessed jumping from the Club's window. (N.T. May 8, 2006 at 51-67).

### C. Smith's Testimony Concerning his Father

Denmark also contends that trial counsel was ineffective for failing to object to Smith's testimony on redirect examination that he was hesitant to testify because his father had been killed in an unrelated case as a witness. As discussed above, on cross-examination, trial counsel attempted to impeach Smith by implying that he was attempting to falsely implicate Denmark. To rebut this on redirect examination, the government asked Smith if there was a reason that he did not want to come forward as a witness in this case, and Smith answered that his father had been murdered in an unrelated case, and he believed that his father had been a witness in that case. Smith testified as follows:

> Q. And Mr. Smith, let me ask you too. Is there something that occurred early in your life, a few years before this fire incident, that caused you to be hesitant about coming forward and being a witness in this case?
> A. Yes.
> Q. And –
>     Mr. Campbell: Objection. Relevance.
>     Mr. Troyer: It goes to bias and motive.
>     Mr. Campbell: Bias and motive?
> Mr. Troyer: Well, he - - it was - - response to cross-examination.
> The Court: Sustained.
> Mr. Campbell: Withdrawn.
> The Court: As far as that reason.
> Mr. Troyer: Okay. All right.
> By Mr. Troyer:
> Q. Is there a reason that you did not want to come forward as a witness in this

>    case?
>    A. Yes.
>    Q. And what is that reason, sir?
>    A. My dad was murdered earlier in life, a couple of years earlier.
>    Q. And was that 'cause your father was a witness in another case?
>    A. I believe so. I don't - - really know about it.

(N.T. May 9, 2006 at 184:9-185:9).

 Although, Denmark complains about the admissibility of this evidence, as the above-testimony indicates, trial counsel did object. However, such questioning was permissible to rebut claims of bias and motive of the witness. Thus, counsel's actions cannot be deemed "deficient" under Strickland's first prong, and this claim is therefore dismissed.

  **D. Failure to Call Prior Counsel as Witnesses**

 Denmark next asserts that his conviction for making false statements in bankruptcy was the result of ineffective assistance of counsel. Denmark argues that he told trial counsel that he did disclose a mortgage debt to his bankruptcy attorney, Maria Palladino, Esq. ("Palladino"), but she failed to include it in his bankruptcy petition. He maintains that Palladino was fully aware of the debt, but could not obtain a copy of the mortgage documents because they were in the possession of the attorney who represented him in grand jury proceedings, James Lammendola, Esq. ("Lammendola"). Denmark claims that trial counsel should have called Palladino and Lammendola as witnesses at trial to support this assertion.

 Decisions on which witnesses to call are generally strategic decisions entrusted to counsel and are protected from second-guessing. Sanchez v. Tennis, No. 04-4005, 2005 WL 645926, at *9 (E.D. Pa. Mar. 17, 2005); United States v. Merlino, 2 F. Supp. 2d 647, 662 (E.D. Pa. 1997). Counsel need not call every suggested witness – only those likely to assist their case. Id. Here, it

is clear that trial counsel made a wise strategic decision in not calling Denmark's prior counsel as witnesses at trial.

William Miller ("Miller") testified at trial that he is a Chapter 13 standing trustee for the bankruptcy court in this District, and he supervised Denmark's bankruptcy in June 2004. He testified that the debtor is obligated under the Bankruptcy Code to disclose his entire financial situation, and that he reviewed Denmark's filings and found that the mortgage debt at issue was not disclosed by Denmark in such filings. He noted that these filings were signed by Denmark on June 10, 2004, and that a hearing for creditors, known as a "341" hearing, was held for Denmark's case on September 27, 2004. Miller explained that the purpose of a "341" hearing is to gather all the creditors that the debtor listed in his or her bankruptcy schedules. The trustee then pages through the schedules, asks the debtor various questions, and ultimately decides either to make a recommendation for a plan or to not confirm a plan. Miller stated that Denmark testified as to his filings and did not disclose the relevant mortgage debt. He added that this hearing was recorded and Denmark testified under oath. (N.T. May 10, 2006 at 44-55).

At trial, this recording was played for the jury. It is apparent that Denmark, who swore to his submissions under oath, had the opportunity at this hearing and before he signed his admissions to clarify or add to the submissions and/or his testimony before swearing to it. Thus, Denmark's bankruptcy fraud count was established by his own testimony and filings under oath.

Moreover, calling Palladino as a witness at trial would likely have been disastrous for Denmark, as she surely would not have testified that Denmark provided this information to her, but that she knowingly submitted false schedules and affidavits to the bankruptcy. In addition, calling Lammendola as witness could also have been a disaster to Denmark's defense in this

case.  To call Lammendola to testify as to attorney-client information would have required Denmark to waive the attorney-client privilege and expose Lammendola to cross-examination on information that could have been very damaging to his defense.  No competent trial attorney would employ such a strategy.  Accordingly, Denmark cannot meet the first prong of the Strickland test, that counsel operated "below an objective standard of reasonableness."  Strickland, 466 at 688.

### E.  Wrongful Conduct of Accountant Booth

Denmark also contends that trial counsel failed to investigate vital information that he gave counsel concerning his accountant, Kenneth Booth ("Booth"), who testified at trial.  Denmark alleges that Booth stole and misappropriated funds of his, and that Booth confessed to this theft in the form of a letter that was left on trial counsel's table at trial, but "came up missing."  Denmark further alleges that trial counsel knew of this evidence, but failed to cross-examine Booth concerning this issue.  (Def's. § 2255 Mot. at 9.)  This claim, however, is entirely unsupported by the record and is denied without further discussion.

### F.  Juror Bias

Lastly, Denmark claims that trial counsel was ineffective for failing to disqualify a potential juror.  He asserts that he informed trial counsel that he knew and had a prior disagreement with a jury panel member who was later admitted as juror number 6, and that such juror was predisposed to finding him guilty.  (Id.)  Again, however, there is entirely no support for such an allegation in the record.  In fact, the record indicates that no juror knew Denmark.

During jury selection, this Court asked the jury panel: "Does any member of the panel know Mr. Denmark?  If so, please raise your hand.  I see no response."  (N.T. May 8, 2006 at

3:25- 4:2). Moreover, after the prosecutor read to the panel a list of the witnesses and interested parties in this case, this Court asked: "Does any member of the panel recognize any of those individuals whose names have just been read? If so, please raise your hand. I see no response." (N.T. May 8, 2006 at 6:8-10.) Thus, the record is devoid of any evidence that Denmark knew and/or had any disagreement with any juror.[9]

**B.    Waived Claims**

A petitioner is procedurally barred under § 2255 from bringing any claims on collateral review which could have been, but were not raised, on direct review. See Bousley v. United States, 523 U.S. 614, 621 (1998); United States v. Biberfeld, 957 F.2d 98, 104 (3d Cir. 1992). Once claims have been procedurally defaulted, the petitioner can only overcome the procedural bar by showing "cause" for the default and actual "prejudice" from the alleged error or that he is "actually innocent." Bousley, 523 U.S. at 621-22; United States v. Frady, 456 U.S. 152, 167 (1982). "Cause" consists of "something external to the petitioner, something that cannot be fairly attributable to him," Coleman v. Thompson, 501 U.S. 722, 753 (1990), and "prejudice" means that the alleged error "worked to the petitioner's actual and substantial disadvantage." Murray v. Carrier, 477 U.S. 478, 494 (1986).

As noted above, Denmark filed a Motion to Supplement his pending § 2255 Motion. In that Motion, he sets out several contentions that are literally incomprehensible.[10] All of these

---

[9] Denmark also claims that this juror sneered and glared at him during the trial. The Court noted no such behavior.

[10] As best as we can interpret, Denmark seems to claim that his due process rights were violated because the Sentencing Commission ignored congressional intent to create alternative sentences for first-time nonviolent offenders, and that restitution should not have been imposed on him because Congress intended restitution to be a "criminal penalty" and not an "equitable

claims, however, were never raised on direct appeal and are now waived.  Moreover, he has not presented any reasons for "cause" for the default and actual "prejudice" from the alleged error, or evidence that he is "actually innocent."  Bousley, 523 U.S. at 621-22.

     An appropriate Order follows.

---

remedy."  (See Mot. to Supp. § 2255.)